UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL DOSS,

      Plaintiff,

-vs-

MICHIGAN DEPARTMENT OF
CORRECTIONS and FRANK SAWYER,
in his individual capacity,

      Defendants.

Case No. 2:20-cv-10266
Hon. Paul D. Borman
Mag. R. Steven Whalen

| | |
|---|---|
| JONATHAN R. MARKO (P72450)<br>**MARKO LAW, PLLC**<br>Attorney for Plaintiff<br>1300 Broadway Street, Fifth Floor<br>Detroit, MI  48226<br>P: (313) 777-7529 / F: (313) 771-5785<br>jon@markolaw.com | RICHARD LINDSEY, JR. (P51342)<br>**ABBOTT, THOMSON, MAULDIN,**<br>**PARKER, BEER & RICK, PLC**<br>Attorney for Defendant Sawyer<br>405 S. Jackson Street, P.O. Box 450<br>Jackson, MI  49204-0450<br>P: (517) 787-8570 / F: (517) 787-8571<br>rlindsey@atbplclaw.com<br><br>PATRICK L. O'BRIEN (P78163)<br>ERIK A. GRILL (P64713)<br>MICHIGAN DEPARTMENT OF<br>ATTORNEY GENERAL<br>Attorneys for Defendant MDOC<br>P.O. Box 3076<br>Lansing, MI  48909<br>P: (517) 335-4659 / F: (517) 335-7640<br>obrienp1@michigan.gov |

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

Page **1** of **19**

NOW COMES the Plaintiff, by and through his attorneys, Marko Law, PLLC, and for his First Amended Complaint against the above-named Defendant, states as follows:

## JURISDICTION AND VENUE

1. Jurisdiction is proper because the amount in controversy exceeds this court's jurisdictional limit, not including costs, interests, and attorney fees.

2. Venue is proper because material transactions and occurrences took place in Wayne, and Defendant conducts systematic business in Wayne County.

## PARTIES

3. Plaintiff Michael Doss is an African American male, residing in the City of Jackson, County of Jackson, and State of Michigan.

4. Defendant Michigan Department of Corrections (hereinafter "MDOC") is a governmental body of the State of Michigan, created pursuant to the laws of the State of Michigan, which, at all relevant times, employed plaintiff, and systematically conducts business in the County of Wayne, including operating multiple prisons and facilities in Wayne County, including the Detroit Reentry Center, the Detroit Detention Center, and multiple probation offices.

5. Defendant Frank Sawyer is a Captain employed by the Michigan Department of Corrections at the Parnall Correctional Facility location.

6. This cause of action involves violations of Plaintiff's civil rights, as secured by the United States and Michigan Constitutions, and is brought pursuant to Title VII of the Civil Rights Acts of 1964, as well as the Fourteenth Amendment to the United States Constitution, and pendant claims arising under the laws of the State of Michigan

## FACTS

7. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

8. Plaintiff is one of few minorities employed by the MDOC at the Parnall Correctional Facility. Most of his co-workers are Caucasian.

9. Plaintiff was an employee of Defendant MDOC for the past thirteen (13) years and has worked as a correctional officer in Defendant's Parnall Correctional Facility ("Parnall") for the past twelve (12) years.

10. Plaintiff was an exemplary employee and, in fact, was rapidly climbing up the employment ladder at Parnall.

11. In 2017, Plaintiff was working as a Captain at Parnall.

12. In addition to Captain duties, Plaintiff was regularly asked to perform many duties that went above and beyond the scope of his position. He was often directed by the Deputy Warden, Lee McRoberts, ("DW McRoberts") to make

decisions and give direction to those in the same classification as himself (i.e., other Captains); namely, Captain Jeff Lang and Captain Frank Sawyer.

13. DW McRoberts, Captain Lang, and Captain Sawyer are all Caucasian.

14. DW McRoberts and Captain Sawyer are known to be close friends.

15. Additionally, DW McRoberts would often call Plaintiff after Plaintiff's scheduled shifts ended to ask him for help in resolving staffing and work process issues.

16. Though Plaintiff is a dedicated employee and was more than glad to help, he was never compensated for this extra work.

17. As an example of his integrity and work ethic, Plaintiff never complained about lack of compensation for these extra duties—he accepted his added responsibilities because he wants to improve Parnall and continue to grow in his career.

18. However, as DW McRoberts assigned more responsibilities to Plaintiff, Captains Lang and Sawyer grew resentful and began acting negatively towards Plaintiff.

19. Captain Sawyer often made comments to other MDOC employees that Plaintiff "must think [he's] their boss" or sarcastically calling Plaintiff "Deputy Doss".

20. On or about December 16, 2017, Parnall Correctional Facility put on a Christmas party for its employees.

21. On December 19, 2017, Plaintiff received a phone call from an anonymous source, informing him of a conversation that had taken place at the facility Christmas party on December

22. Plaintiff was informed that DW McRoberts, Capt. Lang, Capt. Sawyer, and other MDOC employees (including a Lieutenant) were seated at a table when DW McRoberts mentioned an upcoming interview he had for a Warden position.

23. Capt. Sawyer responded to DW McRoberts by stating, "You can't go anywhere; I don't want a nigger for a boss" (insinuating that once McRoberts left, Plaintiff would be promoted to Deputy Warden and be Sawyer's direct superior).

24. McRoberts simply responded by saying, "Frank, you can't say that."

25. Despite witnessing this incident, DW McRoberts did nothing to address the issue.

26. The same night that Plaintiff received the anonymous tip, he contacted DW McRoberts to verify the story.

27. DW McRoberts confirmed that Sawyer had made the derogatory remark.

28. Plaintiff then reminded DW McRoberts that the incident constitutes an MDOC Work Rule Violation for Discriminatory Harassment and that he would report it.

29. DW McRoberts had not indicated in any way that he would report the racial slur until Plaintiff became aware of it and stated to DW McRoberts that he would be filing a formal report.

30. DW McRoberts' failure to act and his attempt to conceal the incident also constitute violations of MDOC Work Rules.

31. Since then, Plaintiff has been subjected to a culture of racism that has been ignored, cultivated, and/or perpetrated by Defendant MDOC and employees at Defendant's facilities, including co-workers, secretaries, supervisors, and other individuals in management.

32. In the days following the Christmas Party, Plaintiff began to notice a difference in the way his coworkers treated him.

33. Previously friendly coworkers suddenly began to treat him coldly and abruptly.

34. Multiple staff members have sided with Capt. Sawyer, stating that it was "not fair" that Sawyer could get in trouble for his comment.

35. On December 21, 2017, Plaintiff formally filed Discriminatory Harassment paperwork with Harassment Coordinator Lori Conant.

36. This complaint was investigated by MDOC Internal Affairs, wherein Capt. Sawyer admitted to making the racial slur and was given a reported 5-day suspension, to which he laughed and bragged about to other MDOC staff members.

37. Sawyer reportedly stated that all he got was five (5) days that he would cover with vacation time and would drink a beer for each day.

38. No investigation was made regarding DW McRoberts failing to report the harassment.

39. Since reporting the incidents and filing a discriminatory harassment complaint, Plaintiff has continued to be subjected to a hostile work environment and has been retaliated against by Defendant and its agents.

40. Immediately after filing the complaint, Plaintiff began suffering retaliation at the hands of his superior, DW McRoberts and later Warden Melinda Braman and Administration at the facility.

41. Plaintiff was singled out and ostracized by his peers. For example, certain Caucasian coworkers would ignore him, ostracize him, and act as if he was not a human being.

42. Staff members began referring to Plaintiff as a "rat" or "snitch" for filing the discriminatory harassment complaint.

43. DW McRoberts no longer contacted Plaintiff to resolve staffing or work process issues, and in fact DW McRoberts began treating Plaintiff as an outcast, socially and professionally.

44. Plaintiff is approached daily by staff members, being forced to discuss the Defendant being allowed to openly call him a "nigger" and the Plaintiff being outcast because of reporting the issue. Staff approached Plaintiff asking why does DW McRoberts hate him so much and why it appears that McRoberts can't stand to be in the same room as him (Plaintiff).

45. DW McRoberts began ignoring Plaintiff and stopped meeting and/or conversing with Plaintiff entirely. DW McRoberts even went so far as to exclude Plaintiff from interview panels and from meetings where work related issues, such as the direction of the facility, were discussed. Plaintiff was a staple at these meetings and on interview panels in the days/years prior to filing the discriminatory harassment complaint.

46. DW McRoberts' only "interaction" with Plaintiff now came in the form of a head nod in passing.

47. On February 19, 2018, Plaintiff was demoted and set up to transfer to an entirely different facility, supposedly because of a "reduction in force".

48. Though Plaintiff ended up not having to transfer to a different facility, McRoberts assigned him to 2nd Shift (Plaintiff was previously on 1st Shift), without conferring or corresponding with Plaintiff in any way regarding this issue.

49. On April 3, 2018, Plaintiff was Issued a Formal Written Counseling from DW McRoberts, the first of his career due to a subordinate being late turning in a report. That subordinate staff member worked directly with DW McRoberts with the Plaintiff acting only as a mentor when needed. DW McRoberts was the primary cause of the report being turned in late. Plaintiff filed a Grievance to have the Written Counseling removed from his employee file; this grievance was denied.

50. On one occasion Plaintiff was speaking with a group of coworkers when one staff member made the comment, "All we have to do is get some Hennessy and fried chicken and Mike (Plaintiff) would come over to help in a heartbeat." This is a racist, derogatory comment implying that all African Americans drink Hennessy and eat friend chicken.

51. Plaintiff is under scrutiny and questioned by Defendant and the Administrative Staff for every decision made as if he is now unable to routinely help manage the institution in its daily operations.

52. Plaintiff has been overlooked by DW McRoberts for opportunities to be placed in Acting Positions (Captain/Inspector) which he normally would have been selected. This disregard along with the Plaintiff being demoted due to a

"reduction in force" led to the Plaintiff being disqualified for a promotion opportunity.

53. Plaintiff inquired into the possibility of becoming an Acting Inspector and fill one to the two vacant positions at the facility; Plaintiff has been the backup/acting Inspector for the last 4 plus years. Plaintiff was overlooked for this position without consideration. (This was the first Acting Inspector position available since plaintiff made the Discriminatory Harassment complaint).

54. On September 7, 2018 (Friday), Plaintiff was contacted by Human Resources informing him that he had received a recall to a different facility and had to decide to accept or decline the transfer by the coming Monday. This is completely against normal process and appears to be an attempt to remove the Plaintiff from the facility.

55. September 12, 2018, Plaintiff submitted a Discriminatory Harassment complaint directly to the MDOC EEOC office. Plaintiff had submitted a complaint in July and was told that the complaint must have been "lost". On December 5, 2018, Plaintiff inquired as to the status of the September complaint (MDOC policy states that DH complaints will be investigated within 45 days)

56. Human Resources contacted Warden Braman about the possibility of recalling the Plaintiff to a vacated Inspector position at the facility. The Plaintiff had been the backup to the Inspector position and had taken on the role on several

occasions for multiple years (4). Warden Braman replied to HR stating that she was not interested in filling the position by transfer because there were multiple qualified applicants and wanted to review to applicant pool and interview. In the next coming weeks Warden Braman went against the decision she previously made accepted a transfer of Brock Simmons (Caucasian) to the Inspector position from an outside facility.

57. Plaintiff is forced to interact with Defendant daily feeling intimidated and unsure of himself while other staff in the area make comments, watch and wait for something to "happen".

58. Staff members repeatedly state to the Plaintiff, "I can't believe you haven't punched someone in the face for the way they treat you like shit around here."

59. Defendant's racially hostile culture is so pervasive that a prisoner, Kevin Dowd ("Dowd"), at Parnall was motivated to come forward and give a statement regarding Sawyer's treatment of Plaintiff.

60. Dowd stated that, in mid-April, he heard Capt. Sawyer mentioning to other correctional officers, "If they want to try and demote me because of this [expletive] I said about Doss at that party I am going to go at their [expletive]…Doss…should be fired anyway."

61. Sawyer has also been heard by staff and other inmates calling Doss a "nigger" and stating that he would never work for one.

62. On one occasion the Plaintiff was sitting in the Control Center with approximately 4 to 5 other staff members (all Caucasian) when Warden Melinda Braman entered to introduce a new employee. She introduced the employee to everyone in the room but excluded the Plaintiff. This act exhibited a total disregard of the Plaintiff's existence. One staff member who was in the area stated to the Plaintiff in a loud voice, "the Warden didn't introduce you because you were the only non-white in here."

63. Plaintiff entered the Control Center along with a coworker. DW McRoberts was seated in Control Center and stood and gave a formal greeting including a handshake to the staff member walking along with the Plaintiff. After greeting the first staff member, DW McRoberts instantly sat down and gave the Plaintiff a simple head nod, saying "Hi" in a low almost whispering tone and a glaring look of disgust on his face.

64. Plaintiff was in Control Center with other staff members (all Caucasian) and deer hunting came into the conversation. The Administrative Assistant overheard the conversation and stated "Doss doesn't know anything about hunting. He can't even spell Venison." Staff in the area continued to make mention of the tension left in the room by the statement.

65. Plaintiff Written a Formal Written Counseling. This Formal Written Counseling was issued by Capt. Jeff Lang at the direction of the Deputy McRoberts and the Administrative team. This written counseling held no merit and was issued twice in order to find a legitimate angle to issue the counseling. Capt. Lang disagreed with the counseling but was forced by Administration to issue it.

66. Plaintiff submitted a grievance to have the frivolous Written Counseling removed from his personnel file. On January 23, 2019, Plaintiff met with Assistant Deputy Director Lloyd Rapelje to discuss the grievance. During this meeting ADD Rapelje talked down to the plaintiff in a condescending manner continually referring to the plaintiff as "Lieutenant" and reminding the plaintiff the he (plaintiff) was once a Captain and should know his job. ADD Rapelje stated that the plaintiff should feel lucky to have just been written a Formal Counseling and that he could have been placed under investigation and suffered a harsher punishment. ADD Rapelje denied the grievance on a memo dated January 17, 2019 nearly a week prior to having the meeting with the plaintiff showing that the response was predetermined to deny the grievance.

67. February 6, 2019, plaintiff contacted ADD Rapelje's office requesting a copy of the response of his grievance meeting in order to proceed to the next step. Pamela Shaver (secretary for ADD Rapelje) informed the plaintiff the response was delivered to Warden Braman's office soon after the January 23, 2019 meeting and

she did not understand why the Plaintiff hadn't received it. Plaintiff was contacted by Warden Braman's office and received the grievance response almost immediately after speaking to Pam Shaver about not receiving the document. This was an attempt to hold the document from the plaintiff causing a delay in the plaintiff's ability to proceed to the next step in the grievance process. This delay along with ADD Raplje dating the grievance nearly a week early delayed the plaintiffs filing of a Step 2 grievance enough that the Step 2 Grievance was denied due to being filed untimely.

68. February 13, 2019, Plaintiff was notified that he was being placed under investigation for using a Department of Corrections copy machine to make a one-page copy to use as evidence to support his grievance.

69. Plaintiff was notified by email of his upcoming Disciplinary Conference for the aforementioned investigation. This confidential information was relayed to the entire facility via email in an attempt to embarrass the plaintiff. Staff members begin questioning Plaintiff asking what he did to be in trouble and questioning plaintiffs' credibility as a supervisor.

70. In June of 2019, although being the most qualified applicant for a promotion to a captain position, the plaintiff was overlooked further impeding the plaintiff career path.

71. Captain Sawyer and other members of his Command Staff have informed other staff members not to trust the plaintiff and be careful what you say around him because he's a "crying snitch."

72. September 16, 2019, Deputy Warden McRoberts transferred back to the Parnall Correctional Facility intensifying the tension and hostility toward the Plaintiff.

73. Plaintiff sent to attend "Basic Investigator Trainer" along with other supervisors from throughout the state. During the training, which was partly focused on Discriminatory Harassment Investigations, the Plaintiff had to constantly field questions from his peers as to why he lost his position as a captain and what he did to not get the job back. These conversations are often presented to the Plaintiff making him feel embarrassed and uneasy.

74. Plaintiff was notified by his supervisor (Captain Bailey) that she was made aware of an ongoing investigation on Warden Melinda Braman and the Parnall Correctional Facility Administration as a result of Discriminatory Harassment paperwork submitted by the Plaintiff. This information was passed to the Plaintiff's supervisor in an attempt to cause dissention between the Plaintiff and his supervisor. The Discrimination complaint focuses on the Plaintiff being overlooked for the captain position his current supervisor was promoted to.

75. Plaintiff has been denied numerous promotions as retaliation for his protected activities.

76. As a result of Defendant's actions, Plaintiff has suffered and will continue to suffer, including but not limited to, the following:

   a. Demotion;

   b. Stress;

   c. Time off work;

   d. Humiliation;

   e. Non-economic damages;

   f. Economic damages;

   g. All other injuries to be discovered throughout discovery;

   h. Attorney fees and costs.

## COUNT I
## VIOLATION OF MICHIGAN ELLIOT-LARSEN CIVIL RIGHTS ACT
*Disparate Treatment*

77. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

78. At all relevant times, Plaintiff was an employee and Defendant was an "employer" within the meaning of Michigan's Elliot-Larsen Civil Rights Act ("ECLRA"), MCL 37.2101, *et seq*.

79. At all relevant times, under the ELCRA, Plaintiff had a right to employment free from discrimination based on his race and/or color.

80. Defendant, through its agents, representatives, and employees, was predisposed to discriminate on the basis of race and/or color and acted in accordance with that predisposition.

81. Defendant, through its agents, representatives, and employees, treated Plaintiff differently from similarly situated Caucasian employees in the terms and conditions of employment, on the unlawful basis of race and/or color.

82. Plaintiff has been denied several promotions based on race and/or color.

83. As a direct and proximate result of Defendant's unlawful actions, Plaintiffs have suffered and continues to suffer injuries and damages.

## COUNT II
## VIOLATION OF MICHIGAN ELLIOT-LARSEN CIVIL RIGHTS ACT
*Hostile Work Environment*

84. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

85. At all relevant times, Plaintiff was an "employee" and Defendant was an "employer" within the meaning of ECLRA, MCL 37.2101, *et seq*.

86. Plaintiff was subjected to unwelcome and heinous verbal conduct due to his race and/or color.

87. Plaintiff complained about the unwelcome verbal conduct, stating that it was clearly based on his racial status.

88. The Defendant violated Plaintiff's rights under the ELCRA by allowing the unwelcome conduct to affect a term or condition of employment, including unreasonably interfering with Plaintiff's work performance, and thus creating an intimidating and hostile work environment.

89. As a direct and proximate cause of Defendant's unlawful actions, Plaintiff has sustained and continues to sustain injuries and damages.

## COUNT III
## VIOLATION OF MICHIGAN ELLIOT-LARSEN CIVIL RIGHTS ACT
*Retaliation*

90. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

91. Defendant retaliated against Plainti for filing complaints regarding Defendant's discriminatory and unlawful practices.

92. Plaintiff has been denied many promotions in retaliation for his protected civil rights activity.

93. Defendant's actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities.

94. As a direct and proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer damages and injuries.

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court grant judgment in favor of Plaintiff and against Defendants in an amount the Court of jury deems just and fair, plus interest, costs, and attorney fees.

Respectfully submitted,

/s/ *Jonathan R. Marko*
Jonathan R. Marko (P72450)
**MARKO LAW, PLLC**
1300 Broadway Street, Fifth Floor
Detroit, MI 48226
(313) 777-7529 / Fax: (313) 777-5785
Dated: April 12, 2021                Email: jon@markolaw.com

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each attorney of record on **April 12, 2021** via:

- ☐ U.S. Mail
- ☐ Hand Delivered
- ☐ Certified Mail
- ☒ ECF System
- ☐ Fax
- ☐ Overnight Carrier
- ☐ Other: Mi-FILE Truefiling
- ☐ Email

*/s/ Melinda S. Morisset*